THE BANK OF THE UNITED STATES, PLAINTIFF IN ERROR, *v.* THE UNITED STATES.

By a treaty between the United States and France, the latter agreed to pay to the former a certain sum of money, the first instalment of which became due on the second of February, 1833.

The secretary of the treasury, under a power conferred by Congress, drew a bill of exchange upon the French government, which was purchased by the Bank of the United States.

Not being paid, upon presentation, it was protested and immediat 'y taken up by bankers in Paris, for the honour of the bank.

The bill is not liable to objection as being drawn upon a particular fund.

The United States, as drawers, are responsible to the bank for fifteen per cent. damages under a statute of Maryland, which allows that amount to the holder of a foreign protested bill.

When the bankers in Paris took it up and charged the amount of the bill to the bank, in their account with it, the bank became thereby remitted to its original character as holder and payee.

Under the law-merchant, the drawer of a foreign bill of exchange is liable, in case of protest, for costs and other incidental charges, and also for re-exchange, wnether direct or circuitous. The statute of Maryland, allowing fifteen per cent. fixes this in lieu of re-exchange, to obviate the difficulty of proving the price of re-exchange.

When the bank came into possession of the bill, upon its return, the endorsements were in effect stricken out, and the bank became, in a commercial and legal sense, the holder of the bill.

THIS case was brought up by writ of error from the Circuit Court of the United States for the district of Pennsylvania.

The facts in the case were these:

By the second article of the Convention of 4th of July, 1831, between the United States and France, which was ratified on 2d of February, 1832, 25,000,000 of francs, with interest at the rate of four per cent. per annum, were payable, at Paris, in six annual instalments, into the hands of such person or persons as should be authorized by the government of the United States to receive it, the first instalment to be paid at the expiration of one year next following the exchange of the ratifications. It was further agreed, however, by the treaty, that the sum of 1,500,000 francs should be reserved by France for purposes therein stated.

On the 13th of July, 1832, Congress passed an act by which it was made the duty of the secretary of the treasury to cause the several instalments, with the interest thereon, payable to the United States in virtue of the said convention, to be received from the French government and transferred to the United States in such manner as he might deem best, and the nett proceeds thereof to be paid into the treasury.

In October and November, 1832, and January, 1833, a correspondence took place between Louis McLane, secretary of the treasury, and Nicholas Biddle, president of the Bank of the United States, upon the best means of transferring to the United States the first instalment, which would become due on the 2d of February, 1833. Mr. Biddle offered to purchase the bill at the rate of five francs thirty-two and a half centimes to the dollar, which would have yielded to the government $912,050 77, but this offer was declined by the secretary. Subsequently, on the 30th of January, 1833, a negotiation was concluded at the rate of exchange of five francs thirty-seven and a half centimes to the dollar, and the following bill was drawn:

[L. s.] *Treasury Department of the United States,*
*Washington, February 7th, 1833.*

Sir,—I have the honour to request, that at the sight of this, my first bill of exchange, (the second and third of the same tenor and date, unpaid,) you will be pleased to pay to the order of Samuel Jaudon, cashier of the Bank of the United States; the sum of 4,856,666 francs and 66 centimes; which includes the sum of $3,916,666 66, being the amount of the first instalment to be paid

to the United States under the convention concluded between the United States and France, on the 4th of July, 1831, (after deducting the amount of the first instalment to be reserved to France, under the said convention,) and the additional sum of 940,000 francs, being one year's interest at four per cent. on all the instalments payable to the United States, from the day of the exchange of the ratifications to the 2d of February, 1833.

I have the honour to be, with great respect, your
obedient servant,
Signed LOUIS McLANE.

*Mr. Humann,*
Minister and Secretary of State for the Department of Finance, Paris.

E. 2682—Mem.

| | |
|---|---:|
| Total amount of indemnity payable to the U. States, | 25,000,000 00 |
| Less amount of indemnity to be reserved to France, | 1,500,000 00 |
| | 23,500,000 00 |
| 1 year's interest from 2d Feb. 1832, to 2d Feb. 1833, at four per cent. - - - - | 940,000 00 |
| First instalment payable to the United States, - | - 3,916,666 66 |
| Amount of the bill, - - - - - | - 4,856,666 66 |

This bill was purchased by the Bank of the United States on the 11th of February, 1833, at the above-mentioned rate of exchange of five francs and thirty-seven and a half centimes to the dollar, and the amount of $903,365 89 cents carried to the credit of the treasurer of the United States, which sum was increased on the 9th of March, by adding $200 for a short credit given, thus making altogether the sum of $903,565 89 cents.

The bill was accompanied by a power from the President of the United States, authorizing Samuel Jaudon to receive the amount of the bill, and to give full receipt and acquittance to the government of France.

The bill was endorsed:

Pay to the order of Messrs. Baring, Brothers and Co., of London.
(Signed,) S. JAUDON,
*Cashier of the Bank of the United States.*

Pay to the order of N. M. Rothschild, Esq., value received.

      (Signed,)        BARING, BROTHERS and Co.

London, 19th March, 1833.

Pay to Messrs. De Rothschild, Brothers, or to their order, value in account.     (Signed,)        . N. M. ROTHSCHILD.

London, 19th March, 1833.

It was presented for payment on the 22d of March, 1833, at the office of Mr. Humann, the laws of France not allowing any days of grace. The answer of the cashier of the central money-chest of the public treasury was, " that having had the orders of the minister, secretary of state for the department of finance, he was instructed to say that diplomatic treaties, which impose engagements on the French treasury to be discharged, do not become obligatory upon it until the Chambers have sanctioned the financial dispositions which are therein embraced. Therefore, the treaty concluded with the United States, not being yet sanctioned by the legislature, the minister of finance cannot at present make any payment to avail upon the obligations contracted by the said treaty."

The notary further states, that immediately after the protest Messrs. Hottinguer and Co., bankers, intervened for the account of Mr. Samuel Jaudon, cashier of the Bank of the United States, and agreed to pay the amount of the bill and costs.

On the 30th of March, 1833, Hottinguer and Co. made up the following account against the bank.

Statement of the payment and charges made by Hottinguer and Co., of Paris, on a bill of 4,856,666 66, drawn by the secretary of the treasury of the United States upon M. Humann, minister of finance, protested for non-payment, and which they paid for the honour of the signature and for account of S. Jaudon, cashier of the Bank of the United States of America.

F.   4,856,666 66 amount of the bill.

      24,283 33 commission half per cent.

---

F.   4,880,949 99

      3,399 90 stamp.

        27 65 protest and translation.

        14 45 second and third of protest and legalization.

        35 00 paid to American consul at Havre, expenses for the document to be copied upon his books.

---

F.  4,884,427 99.

Say four million eight hundred and eighty-four thousand four hundred and twenty-seven francs and ninety-nine centimes, which we place to the debit of the Bank of the United States, due 22d March, 1833.

Errors excepted. HOTTINGUER.
Paris, 30th March, 1833.

On the 26th of April, 1833, the bank received information of the fate of the bill, and on the same day informed the secretary of the treasury that they would hold him responsible for principal, interest, costs, damages, and exchange.

On the 13th of May, 1833, the bank forwarded to the secretary the following account:

*Bank of the United States, May 13, 1833.*

Account of return, with protest for non-payment, of a bill of exchange drawn by Louis McLane, secretary of the treasury, dated Treasury Department of the United States, Washington, February 7th, 1833, at sight, to the order of Samuel Jaudon, cashier of the Bank of the United States, on M. Humann, minister and secretary of state for the Department of Finance, Paris:

| | |
|---|---:|
| Principal due, March 22, 1833, - - | fr. 4,856,666 66 |
| Costs of protest, as per Messrs. Hottinguer and Co.'s account of charges herewith, exclusive of their commission, which is covered by the damages charged below, - - | 3,478 00 |
| | 4,860,144 66 |
| Interest from March 22d (the date of protest,) to May 13th, fifty-two days - - - | 42,121 25 |
| Damages on fr. 4,856,666 66 at 15 per cent. | 728,500 00 |
| | 5,630,765 91 |

Which, at 5 30, the current rate of exchange for a bill, at sight, on Paris, is $1,062,408 66, due in cash this day, with interest until paid.

On the 16th of May, 1833, the secretary replied that the proceeds of the bill had not been brought into the treasury by warrant, and therefore he had it in his power to return the amount immediately to the bank; which was accordingly done, and on the 18th of May the bank debited the United States upon its books with the sum of $903,565 89, being the exact sum for which the bill had been bought.

Bank of the United States *v.* The United States.

On the 24th of May, 1833, the attorney-general of the United States addressed the following letter to the secretary of the treasury:

*Attorney-General's Office, May* 24, 1833.

Sir—I have carefully examined the claims presented by the Bank of the United States, on account of the protest of the bill of exchange drawn by you on the French government for the first instalment and interest due the United States, under the convention with France of July 4, 1831.

The account stated by the bank, if supported by proper vouchers, appears to be correct, with the exception of the claim of fifteen per cent. damages on the amount of the bill. This item, in my opinion, has no foundation in law or in equity, and ought not to be paid by the government. The bank is entitled to indemnity, and to nothing more.

I will take another occasion to state to you the reasons on which my opinion is formed, and

Am very respectfully, your obedient servant,

(Signed,) R. B. TANEY.

To the Secretary of the Treasury.

On the 7th of July, 1834, the bank declared a dividend of three and a half per cent. on its capital stock, which, upon 66,692 shares held by the United States, amounted to $233,422.

On the 10th of April, 1835, the secretary of the treasury drew upon the bank for the difference between this sum and the amount which the bank claimed to hold for the purpose of paying itself the damages on the protested bill, being as follows:

| | |
|---|---|
| Amount of dividend, | $233,422 |
| Claimed by the bank on that day, | 170,041 18 |
| Amount drawn for by secretary of the treasury, | $63,380 82 |

On the 29th of July, 1837, the first auditor of the treasury stated an account with the bank, in which he sanctioned the principle of all the claims of the bank, except that for fifteen per cent. damages, saying that the costs and charges for stamp, protest, &c., together with the charge of Hottinguer for commission, were disallowed " for want of vouchers merely," but, if properly vouched, would be admissible.

The United States brought a suit against the bank on the second of March, 1838, for the withheld portion of the dividend, being $170,041 18, with interest. The bank claimed a set-off as follows:

| | |
|---|---|
| Amount claimed in letter of 13th May, 1833, | $1,062,408 66 |
| Refunded by the United States,    -    - | 903,565 89 |
| | |
| Amount of set-off,   -   -   -   - | $158,842 77 |

with interest from 13th of May, 1833.

The bill having been drawn in that part of the District of Columbia where the laws of Maryland, anterior to the cession, were in force, the following statute of that state, a knowledge of which is necessary to understand the points raised in the bill of exceptions, is transcribed:

"November, 1785.—Chap. 38.

An act ascertaining what shall be recovered on protested bills of exchange, and to repeal an act of Assembly therein mentioned.

"Be it enacted by the General Assembly of Maryland, That upon all bills of exchange hereafter drawn in this state on any person, corporation, company, or society, in any foreign country, and regularly protested, the owner, or holder of such bill, or the person or persons, company, society, or corporation, entitled to the same, shall have a right to receive and recover so much current money as will purchase a good bill of exchange of the same time of payment, and upon the same place, at the current exchange of such bills, and also fifteen per cent. damages upon the value of the principal sum mentioned in such bill, and costs of protest, together with legal interest upon the value of the principal sum mentioned in such bill from the time of protest, until the principal and damages are paid and satisfied: and if any endorser of such bill shall pay to the holder, or the person or persons, company, society, or corporation, entitled to the same, the value of the principal, and the damages and interest as aforesaid, such endorser shall have a right to receive and recover the sum paid, with legal interest upon the same, from the drawer, or any other person or persons, company, society, or corporation, liable to such endorser upon such bill of exchange."

The court, after instructing the jury that the case was to be governed, in respect to the set-off or credit claimed by defendants, by the enactments of the said statute of Maryland; and that if they had been the holders of the said bill at the time of its protest, they would, under the said statute, have been entitled to the set-off or credit claimed,—the damages being, in such case, made by the provisions of the said statute a part of the debt as much as the principal, to which they were admitted to be entitled,—proceeded further

to instruct the jury, that by the endorsements and protest given in evidence, defendants did not appear to have been such holders of said bill at the time of its protest.; that their position was that of endorsers, who had taken it up or paid it ; and that whether they had so paid it in the place where it was payable or elsewhere, they could not sustain their claim to the damages in question, unless by proof that they had themselves paid such damages to the holder of the bill; and that the verdict on this point ought to be in favour of the plaintiff.

Whereupon the counsel for the defendants excepted to the opinion of the court.

The jury found for the plaintiffs, and assessed the damages at $251,243. 54.

The case came up to this court upon the exception just recited, and was argued by *Cadwallader* and *Sergeant*, for the plaintiffs in error, and *Nelson*, (attorney-general) for the defendant in error.

*Cadwallader*, for the plaintiffs in error.

Since the bill was drawn, and even since the suit was brought, this court has settled many of the questions intended originally to be raised on the trial.

The last of these decisions was that in 15 Peters, 391, which took place in the interval between the institution of the suit and the trial, where the court decided that "where the United States become a party to drafts, they were under all the liabilities of private individuals."

The only two questions in the case are, therefore,

1. Whether, under the statute of Maryland, a private drawer would be answerable, on the bill in question; and

2. Whether, if so, there is any thing in the relation existing between the parties to divest this responsibility.

1. We contend that the defendants below were within the description of "owner or holder of the bill or party entitled to it," mentioned in the first clause of the statute, and not within that of endorser, in the latter clause. To entitle a party to the benefit of the first clause, it is not necessary that he should have been holder at the time of protest; but, nevertheless, the defendants below were, in fact, holders of the bill at the time of protest, through the intervention of their agent, who, at that time, interposed, for their account, and took up the bill at the place where it was payable.

The fifteen per cent. is not well named, when it is called "damages." It is not a penalty, but as much a part of the transaction as re-exchange, certainly not unliquidated because it can be easily calculated. It was described, in the court below, as a penalty to punish delinquency or insure punctuality; but is really intended to mitigate the rigour of law against a drawer. Re-exchange would often be ruinous, and particularly with the colonies. The explanation of re-exchange is given in Story on Bills, 401. The holder has a right to draw for the amount of the bill, and must do it in the same way that the bill came. It is often circuitous. The general course of exchange is often so between two countries, and sometimes the circuity is casual. All the colonial statutes were to limit the amount for which a drawer should be held responsible, and did not intend to inflict a penalty.

The rate of these damages varies; it is not the same between England and the West Indies that it is between England and the East Indies. Chitty, 668; Story, sect. 408; Beawes on Bills, 610.

Damages were fixed in lieu of re-exchange. 6 Cranch, 221; 6 Mass. 157, 161.

The history of Maryland legislation shows that it was intended for the benefit of the drawer, by limiting the responsibility which he would have been otherwise under. Acts of 1676 and 1678 say "the party shall not be allowed more than," &c. So the acts of 1692, 1699, 1704, 1708, and 1715. The act of 1715 is found in Bacon's Laws, the others were read from MS. copies.

The French Code of Commerce, 183, art. 445, edition of 1814, says, that damages are a compensation for the circuitous transmission of a bill. Great injury is sustained by taking funds provided for other purposes, and being obliged to take up a protested bill. 3 Marshall, 184; John H. Piatt's case, in 19 State Papers, 734.

In the latter case, an act of Congress of 1820 referred it to the second comptroller. In 1823, it came before Congress again, and a committee reported upon it. Pp. 894, 904. The report says equitable principles require damages to follow protested bills. Piatt had not paid damages, "but this is a question never asked; the fact of protest is sufficient."

Damages cannot be sued for separately. 4 Har. and Johns. 240.

In Ambler, 672, Lord Camden says, "the twenty per cent. is a part of the original contract." See also, 2 Campb. 445; 12 East, 420;

8 Watts, 546; Story, sect. 398, note; 1 Lutw. 885; 7 Term R. 570, 577; 4 Barn. and Cres. 445.

The argument on the other side is, that the endorser who pays is not a holder under the statute; but this is contrary to the general law; and the object of the statute was to give indemnity to any sufferer.

If an endorser, or his agent for his honour, takes it up *supra protest*, he becomes the holder. Thus full effect is given to the whole act. The argument on the other side requires an interpolation of the words "time of protest." By providing for the case of an endorser who has paid damages, the statute intends an action on the bill; but it does not restrain an endorser who has become holder without paying damages, because the whole statute is enlarging. In this case, the ownership was resumed at the time of protest.

An endorser who paid the bill could not, without the statute, recover any thing except the amount of the bill and the damages; but the statute gives him interest also. It is, therefore, an enabling statute. At the time of the act it was doubtful what an endorser could recover; 2 Durnf. and East, 100. Two years after the Maryland act says there had been doubt. See also 1 Hen. Bla. 640; 4 Durnf. and East, 714; 3 East, 82, 177; 6 Barn. and Cres. 439.

According to the construction which the other side put upon the statute, the case of an endorser who pays the bill without damages is not provided for, unless by implication. And even the implication cannot stand unless by insertion of the words "time of protest."

But the bank had made provision abroad. If a former holder of the bill here, from alarm that it might not be paid, sends his money, abroad, he is as much out of funds as a foreign holder would be.

A payment *supra protest*, for the honour of a name upon the bill, is an exception to the general law of agent or substitution; which is that one person cannot become agent for another without his consent. And this is not only a case of payment *supra protest*, but with funds. See 5 Whart. 189; Pothier, 171; Chitty on Bills, 543; French Code of Commerce, 158; 10 Merlin Repertoire Universelle de Jurisprudence, 74 b, tit. Lettre et billet de change; 1 Espinasse, 113, criticised and explained in Story on Bills, sect. 124, note; Beawes, 54, 570; 1 Lutw. 896, 899.

A party, therefore, paying a bill, with or without funds, becomes a holder under the Maryland law.

The law of Maryland must govern this case. 6 Cranch, 224;

Story on Bills, sect. 153; Story on Conflict of Laws, 307–317; 12 Peters, 524.

The United States must rest on the same obligations as a private drawer when a bill is drawn by an authorized agent. Congress call this a bill. When they settle with the bank it is called a bill of exchange. 4 Story's Laws, 2556, act of 3d March, 1837.

It is so on its face, and in its nature; subject to the same rules, because it was drawn to save freight, insurance, &c. The secretary had a discretion under the act of Congress how to transfer the money. The bank was bound by its charter to transfer the money of the government without exchange, within the United States; of course, on a foreign transaction, exchange would be charged. The secretary sold the bill, and preferred that mode to having it collected. 5 Wheat. 288.

The bank gave the government credit on its books, which is equivalent to payment. 1 Howard, 239; 3 Bro. Chan. Rep. 433.

*Nelson,* attorney-general, for the defendant in error.

The objection to the form of action, which was raised in the court below, is understood to be waived. It is unnecessary, therefore, to argue it.

The damages upon this bill were claimed by the bank by the way of set-off, when sued by the government for the dividend due upon its stock; and were claimed, not upon general principles, but under the statute of Maryland. The only question is the construction of that act.

There are four objections to allowing the bank these damages.

1. That the bank, through its agent, having paid no damages, can receive none, and such was the opinion of the court below.

2. That the instrument is not a bill of exchange within the meaning of the act of 1785.

3. Supposing the bank to have been the holder, and the instrument to be a bill, still the United States, as a sovereign power, are not bound by the penalties of the act.

4. That the relations existing between the parties, and understood by them, were such as to exclude the idea of damages.

1. By the general law-merchant, the holder of a protested bill is entitled to reimbursement or indemnity, the standard of which is interest, expenses, and re-exchange.

In many places, by statute or usage, damages are allowed, differing in amount; and given, in some cases, in lieu of re-exchange,

costs, and interest. The effect is, to dispense with proof of all these things and facilitate adjustment. Sometimes a penalty is superadded.

The statute says the holder shall receive as much money as will purchase a new bill. This is just the definition of re-exchange. Story on Bills, sect. 400. The Maryland bar was celebrated at the time when this statute was passed; and no doubt it was carefully prepared. The definition of re-exchange is "the purchase of a bill on the country where the drawer of the protested bill lives." The statute adopts this in effect, because, although it directs the new bill to be purchased in the country where the drawer of the old bill lives, instead of the country upon which the old bill was drawn, yet the same amount of money would have to be paid in both cases. The statute then provides for re-exchange, for costs, and for interest. But these together constitute indemnity. What is the fifteen per cent. which is then added? It must be a penalty.

The old statutes of Maryland which have been read show this. For example, the act of 1704 says there shall not be allowed more than twenty per cent. more than the principal sum and costs. The act of 1708 says ten per cent. more than the sum and costs. Under these statutes, the amount of damages was required to be proved, because it was left uncertain. The act of 1785 adopts a new principle, by providing indemnity and fifteen per cent. damages. The amount of damages and the rules being thus fixed, a party who claims the one must bring himself within the other.

Rothschild was the holder of the bill. It was in his possession by regular endorsement. Suppose he had omitted to cause it to be protested. He could have recovered damages from nobody, because he would not have brought himself within the terms of the act. And the endorser must bring himself within its operation also. How? By paying the damages to the holder or some subsequent endorser, to whom he was responsible. The statute provides damages for this class of endorsers only. But the bank, having paid no damages, does not belong to this class, and is therefore not within the statute at all. At the time of protest, it is clear that the bank was not the "owner or holder" of the bill; nor was it at any time afterwards within the protected class of endorsers. The reason of the distinction is manifest. An endorser who had parted with the bill and received value for it was put to no inconvenience by the protest, and therefore had no claim upon the drawer for damages.

His claim only began, in reason, when he was himself called upon to pay damages.

It is said by the other side, that the " owner or holder" means also an endorser.   But the act does not say " those who may become entitled to the bill," but uses language indicating existing ownership ; existing at the time of protest.   The second clause of the act says, " and if any endorser of such bill shall pay to the holder, &c., making a clear distinction between the two classes of persons.   How then can they be confounded, and an endorser be allowed to claim as a holder ?   To sustain the construction of the other side, the word " endorser" must be interpolated in the first clause.   That the ownership must exist at the time of protest is clear, from the language of the statute :   " That upon all bills of exchange hereafter drawn in this state on any person, corporation, company, or society, in any foreign country and regularly protested, the owner or holder of such bill," &c.   Such bill ; what bill ?   One that is regularly protested.   The ownership is placed in juxtaposition with the description.   He must have been the owner or holder of the bill when it underwent this ceremony.

As to endorsers, the statute introduces no new principle.   By the general law-merchant, no endorser can receive damages from the drawer unless he has himself paid them.   3 Kent's Commentaries, 115 ; 3 Washington's Rep. 310.

It has been said that the object of the second clause was to provide a new remedy for an endorser.   But was it ?   What were his rights before ?   If Jaudon had been sued in London on this bill, he would have been liable by the English law, for the bank was as much liable for damages as the drawer.   If the bank had paid all this, the drawer would have been liable, independently of the statute, because the drawer would have to replace the bill and expenses.

The statute, therefore, gives the endorser no new remedy.

The bank was an endorser at the time of protest, and must remain so ; it cannot shift its position and become a holder.   The bill was paid for the honour of an endorser after protest ; the only effect of which is to make the payer an endorsee of the bill, and protect the endorser, for whose credit it is taken up, from damages.   1 Espinasse Rep. 113.

2. This is not a bill within the meaning of the act, because it

was drawn upon a particular fund. Story on Bills, sect. 55, 56. A general bill must be drawn upon the general credit of the party. 2 Lord Raym. 1681; 2 Strange, 1211; 5 Espinasse Rep. 247; 2 Kent's Com. 74, 75, 76; 2 Wharton, 233. The act of 1785 only applies to general bills. Here it was drawn upon a particular fund and payable at the pleasure of the French government, because no appropriation had been made by that government for it. It was payable, too, out of the fund provided by the treaty.

3. The United States, as a sovereign power, are not bound by the penalties of an act.

It is settled in England that the government is not bound by a statute unless named. If the state of Maryland was not, then the United States are not. 5 Co. Rep. 14 b; 11 Co. Rep. 74.

Is it possible that Maryland could have intended to provide against her drawing bills as a sovereign, which would not be paid? Her courts have uniformly construed her laws according to the position just laid down; 3 Har. and McHenry, 171.

The question in the above case was this: Under the act of 1785, chap. 80, sect. 7, no creditor was entitled to priority in the division of an intestate estate. But the state claimed a preference; and the court said she was entitled to *jura regalia*. Not being named, she was not embraced within the act. 1 Har. and Johns. 417; 6 Gill and Johns. 226.

4. The correspondence shows that the bank knew that the government was acting merely as an agent for the claimants under the French treaty; that it was but a trustee. The money to be received was not intended to belong to the treasury of the United States, but to be distributed amongst its owners. The only object of all parties was to transfer the money from France to the United States.

*Sergeant*, in reply.

The bill, being drawn in Maryland, is to be governed by the law of Maryland, so far as concerns the drawer. The endorser might be subject to a different rule, having endorsed the bill in Pennsylvania, where the damages are twenty per cent. How the matter would have stood, if the bank had been compelled to pay the twenty per cent., it is not material to inquire.

What is the law of Maryland? There are six acts of Assembly prior to the act of 1785, on the subject of damages. They all have

one title, and they are all restrictive in their terms, that is to say, they restrain or limit the amount of damages by negative words. The first act, made between 1676 and 1678, was nearly, if not exactly the form of expression which is followed in the five subsequent acts.

The act of 1785 is of the same character. They are *in pari materia.* Besides, the act of 1785 has the same title, and being made to repeal and supply the prior acts, it must have the same purpose

These acts assume, and conclusively show, that there was a right to damages before, which they restrain, and fix at a certain per centage. This per centage is not damages given; they existed before. The acts only furnish a rule for computing them. But they are still damages.

He then argued

1. That damages were payable by the law-merchant, in all cases of dishonoured foreign bills of exchange.

2. That these damages were payable by contract, as a part of the contract, and were capable of being ascertained, but only in each particular case.

3. That they have been fixed in some places and trades by usage, and in others by law, but they are still due by contract, and in no respect different from the damages payable by the general law-merchant, except that a rule is established for computing or "ascertaining" them.

1. He referred generally to the books and cases already cited, but especially to Judge Story's work on bills of exchange—466, 467, where the subject is fully explained. The damages are ascertained by the rate of re-exchange. What that is, and how it may operate, we well know; De Tastet v. Baring, 11 East, 265: Mellish v. Simeon, 2 H. Bl. 378, where the damages were fifty per cent; Pollard v. Herries, 3 Bos. and Pul. 335, where they were upwards of two hundred per cent.

It is necessary to understand what "re-exchange" means. It is the right to redraw, at the place where the bill is payable, upon the place where the bill is drawn, for such a sum as will pay the amount on the face of the bill, with costs and expenses, at the place where payable. The law is clearly laid down by Judge Story, in 3 Kent's Com. 115, and in Chitty. It is the right to redraw, and is exemplified in the two cases just cited.

We must distinguish between "exchange" and "re-exchange."

The act of 1785—framed with remarkable accuracy and fullness of knowledge—itself makes the distinction, for it gives the exchange, and then adds the fifteen per cent. The object is, to pay the bill at the time and place where payable, according to the terms of the contract. Messrs. Hottinguer, for example, would have had a right, by the law-merchant, to draw upon the United States, or upon the Bank of the United States, for as much money as would pay them in Paris the amount of the bill. The payment in Paris, therefore, at the time, included the damages. And so, the payment by the Bank of the United States to Messrs. Hottinguer included the damages.

2. They were payable by contract and capable of being ascertained. They were in no sense a penalty. They were a recompense, an equitable equivalent, or more exactly, a fulfilment of the contract, given by the law-merchant, which does not deal in penalties, but looks to equity and substantial justice. This law of damages is founded in the plain equity of the contract, and has nothing in it that is vindictive or penal.

Still less, could they be said to be unliquidated. Where there was an established rate of re-exchange, the price of the day furnished the rule. The law does not require that there should be an actual redrawing. There is an immediate right to redraw, and whether the holder redraw or not, he is entitled to the amount. De Tastet v. Baring. Where there is no such rate established, or it is interrupted or disturbed, no matter how, resort may be had to circuitous drawing, and the actual cost settles it, at the expense of the party liable on the bill. Bangor Bank v. Hook, 5 Greenl. 174; Chitty, 670. These damages are part and parcel of the bill, though contingent, as is also the liability of the drawer and endorser. They are recovered in an action on the bill, as the principal is.

The payment, at the time and place where the bill is payable, therefore, includes the damages. Put the case of a party on the bill, thus paying after protest—he actually pays the damages. They are included in what he pays. In other words, he pays exactly the same as if he had been redrawn upon.

3. In lieu of the right to redraw, usage has in some places fixed a rate of re-exchange or damages, and law in others. Where not so fixed, they remain as they were before. But neither the law nor the usage professes to give the damages. They were payable by the contract, according to the law-merchant. Neither does the law

or usage, in any case, intend to take them away.  They have in view to avoid the fluctuations of exchange, (Story on Bills, 480 ;) to mitigate the occasional rigour of the law-merchant.  Chitty, 665.  The acts of the Maryland legislature had chiefly in view this latter object. It would seem that the rule of the law-merchant had proved very burdensome, which will easily be understood when we consider that there never has been, and is not now, any regular re-exchange between England or the continent of Europe and the United States, and, therefore, recourse was necessary to costly expedients.  They have all one title, " an act ascertaining what damages shall be allowed on protested bills of exchange."  The usage, in some instances, has passed into law.  Neither the usage nor the law altered the nature of the contract, that is, made it less a contract, as to its force or its comprehension.  They had one single object only, and that for the benefit of the party liable.  The damages are still due by contract ; more precisely than before, because the rate is fixed and known, and therefore can be stipulated.  But they rest upon the same equitable contract.  Before, it was an undefined, now a fixed liability—that is, the amount is fixed, where there was already a liability—the redrawing is fifteen per cent., neither more nor less, since 1785.  By the prior acts, it was twenty per cent.

No such act can be presumed to mean any more.  The remedy is applied to a given mischief, and the acts all indicate plainly what that mischief was.  It was the same that has led elsewhere to usages and laws, that is, to substitute a fixed rate of damages for an uncertain one, but by no means to take away the right where it previously existed.

Proceeding, then, more particularly to examine the act of 1785, under the view thus taken of it, he maintained,

1. That the Bank of the United States was the " owner or holder of such bill," and " entitled to the same," within the terms and meaning of the first part of the first section of the act of 1785.

2. That the Bank of the United States had actually paid the damages, and was within the words of the second part of the section.

1. There is a radical error, as already intimated, in supposing the act gives the damages—that there would be none without it.  This leads to error in the whole construction, by taking a wrong departure. The act leaves the right as found, but limits and fixes the amount. It professes to do nothing more.  To this intent, it is to be liberally,

at least fairly, construed. It must be reconciled, if necessary, with the law-merchant. It must not be brought into conflict with that law, by interpretation out of its own words and declared intention. His position was simply this—whoever by the law of the contract was entitled to damages, is entitled still; and the damages are fifteen per cent. Such is the exact effect of a usage. Grimshaw *v.* Bender, 5 Mass. 157, 161, 162. The right to damages attaches upon the protest of the bill. It is no more than this, to compel the drawer to pay the bill, at the time and place stipulated. In favour of whom does it attach? Why of the holder. Of what holder? Of any holder. For there always must be a holder, and there can be but one at a time, though there may be several persons united to make that one. The drawer is not to be put to the risk of paying twice. Therefore, the claim must be made by one who has the possession, with right, so as to be able to give up the bill, with a full and final discharge. The Bank of the United States was the holder, to this full intent. It held the bill, with right, ready to hand it over and give an effectual release. What more could be requisite to make it a holder?

Now let us look at the act of Assembly. It uses the words in the most general sense. It does not restrict them to the holder at the time of the protest, nor to any particular time. It could not so mean. The holder has a transferable right; not negotiable in the broadest meaning of that word, because, being overdue, which is notice, the assignee takes the bill, subject to the equities between the parties. In other respects it is negotiable. The holder may transfer it, as fully as he holds it, and his transferree becomes the holder, with all his rights, including the right to damages. If this be not so, the damages would be lost by the transfer, and the first holder would be the loser, as he would not be paid for the damages, if they could not be transferred, which would be unreasonable and unjust; or else, we should be obliged to consider this as a case not provided for by the act, and turn over the derivative holder to the law-merchant for his rate of damages. But it is clear that the act meant to provide for every case. It applies, therefore, to every holder, and surely the Bank of the United States was a holder.

The right of the bank, however, as holder, is even stronger than has yet been stated, and in point of law sufficient to satisfy any construction of the words, as a moment's attention to the facts will show.

The bank was the original holder of the bill, by purchase from the United States. It endorsed the bill to Barings, and they endorsed it to Rothschild. The bill was dishonoured, and protested for non-payment. Hottinguer and Co., of Paris, strangers to the bill, paid it *supra protest*, for the honour of the Bank of the United States, the endorser. By this payment, Hottinguer and Co. became the holders, were substituted for the holders, with all their rights against the drawer and the first endorser. This is fully settled in France, in England, and in the United States, as may be seen by reference to Pothier, Pardessus, Beawes, Chitty, Story, and every book that treats upon the subject. The only restriction was, that as they paid for the honour of the first endorser, they could make no claim upon the subsequent parties on the bill. They became the holders, at the time of the protest, with full rights against the United States, and the Bank of the United States. These rights were, to redraw, that is, to claim damages, and to transfer their rights as holder. In this state of things, Hottinguers paid themselves, in Paris, the full amount, out of money of the Bank of the United States then in their hands. The bank ratified the payment—that is, the bank paid it to the holders, and the holders (Hottinguers) handed the bill, with all their rights, to the bank. The bank thus became the holder, and was remitted to its former character and rights. Lutw. 896, 899 ; 7 Term R. 570. They were the holders when the bill returned. They were holders, by relation, to the time of the protest. They became the holders, in law, at the time of the protest. They had therefore a right to redraw—that is, a right to damages.

The material fact here is, that the bank paid the full amount in Paris of what was due there. They actually, really, and legally paid the damages, for to pay the bill at the place where payable, after protest, is to pay the damages. It gives the right to recover damages. Suppose the case of circuitous redrawing. Each holder in succession becomes entitled. Mellish *v.* Simeon. The cases are to every intent the same ; if there be a usage, that fixes the amount : and so, if there be a law. To redraw from Paris on Maryland is fifteen per cent. This, the Bank of the United States have, therefore, paid.

2. The Bank of the United States had actually paid the damages, and so was within the words of the second part of the first section of the act of 1785.

It is proper here to notice the objection made on the part of the

United States, that the Bank of the United States was an endorser, and, therefore, could not recover damages, "unless it had paid them or was liable to pay them." This is urged, upon the authority of Chancellor Kent. 3 Kent's Com. 115. That learned author refers, for his support, only to the case of Kingston *v.* Wilson, 4 W. C. C. R. 310. He has been misled by the note at the beginning of the report, where from an error of the press, or some other cause, the point is stated as he has quoted it. But no such question arose in that case, and none such was decided. One of the claims there made was by the drawer of a bill of exchange upon the drawee, for not accepting his bill, and the learned judge who then presided in that court (Judge Washington) said, that in an action by the drawer against the drawee, he could not recover damages, unless he had paid them or was liable to pay them. See 4 W. C. C. R. 316. What the law would be in such a case it is not now material to inquire.

But waiving that question, and supposing (if it be possible) the bank not to have been a holder, how will the matter stand? The bank, it must be premised, no one doubts, is able to give a full discharge.

If being on the bill, and holding the bill, the bank had paid the damages, it would be entitled to recover them from any prior party, with interest. This is not disputed, and cannot be disputed. Had the bank not paid the damages? "The law does not insist upon an actual redrawing," &c. 3 Kent, 115. Nor is the claim for re-exchange or damages confined to bills of exchange. 3 Bos. & Pul. 335; Pollard *v.* Herries, Chitty, 668. It is the substance which is regarded. And so it is in the Maryland act of 1785. The words of the act apply exactly. It does not require that the damages shall be paid *eo nomine*, but the "value" of the same paid to the party "entitled" to the same, as Hottinguer and Co. undoubtedly were here. What was the "value" of the same? Precisely the amount on the face of the bill, in Paris, at the time. That is exactly what they had a right to redraw for. There is nothing artificial or technical in the law-merchant. Chitty, 667. Its principles and its methods are those of common sense and justice applied to the transactions of men. The confusion in this case has arisen from not distinguishing, as the law-merchant does, between paying here and paying abroad. Paying abroad includes the damages, which the act of Assembly fixes at fifteen per cent.

In every point of view, then, the bank has a clear right to the damages. If the United States were authorized to draw, and the government of France bound to accept, the United States will have their recourse over against France for the damages, after paying the bank.

Some minor objections have been made, not properly open upon this record, which may be disposed of in a few words; and a question has been suggested, entitled to attention.

1. It is said this is not a bill within the act, nor in a legal and commercial sense, being drawn on a particular fund.

This subject, of what is not a negotiable bill, is treated fully, and with reference to the authorities, by Mr. Chitty, pages 157, 158, and by Judge Story in section 40, page 54. The exceptions are, when there is a condition or contingency; here, there was neither condition nor contingency.

It has been settled too by the legislative authority. The act of Congress of 3 March, 1837, 4 Story's Laws, 2556, styles it " the bill of exchange."

Again, it calls itself a " bill of exchange;" has always been termed a " bill of exchange;" went forth to the world, and was negotiated as such; has been so treated in all the correspondence; was protested as a bill of exchange, and claimed as such in the suit. It is too late in the day to question its character.

The use it was employed for, to remit or transfer funds, does not make it the less a bill of exchange. 5 Wheat. 288. This is, and always has been the appropriate purpose of bills of exchange, whether they were originally invented by the Jews of Lombardy, or, as Ranké supposes, in his History of the Popes of the 16th century, to collect the revenue in the Papal States.

2. The United States is a sovereign, not affected by penalties in an act of the legislature.

If confined to penalties, the position is of no consequence here, the question not being of penalties. If it be extended to damages, it is authoritatively answered by the United States v. Bank of Metropolis, 15 Peters, 377, 392. See also, 3 Marsh. 184.

Upon what principle can it be contended that a contract of the United States is different from that of an individual? A bill of exchange is a contract well understood, importing definite legal responsibilities. To what extent is it that the difference is to apply?

Will the United States be barred from claiming, as well as exempted from paying damages? They have always insisted upon, and received them, where they were the holders of protested bills. Such a one-sided doctrine would be intolerable. And what would become of the credit of the United States? and the facilities they require in the receipt and disbursement of their revenue, if their bills were thus, as it were, outlawed? Such a doctrine has no countenance in any decision of this court, and it is quite safe to predict it never will have.

3. The relation between the parties—What is it? That of seller and buyer. The United States came into the market with a bill to sell. The Bank of the United States bought it. Nothing could be more simple. There is no mystification in this. See Record, 16, 17, 18, 19. The money being paid into the bank makes no difference. That was agreed, (Record, p. 19;) and without agreement was a thing of course, for the bank was the treasury, and when the money was so placed, it was immediately at the disposition of the government as its own.

But further, the United States have admitted their liability for principal, interest, protest, and expenses, according to the bill of exchange. If not a bill of exchange, why pay for protest? Why a protest or expenses, if not a bill of exchange? They only refuse to pay the damages, which is entirely arbitrary.

If it had not been a bill of exchange, it would still be a contract to pay a certain sum of money in Paris, on a given day. If broken, what would be the measure of damages? Not less, certainly, than upon a bill of exchange. Chitty, 668; Pollard v. Herries, 3 Bos. & Pul. 335.

The objections of the United States are thus disposed of. It is, in truth, a very plain case, now that it has been deliberately examined. The record and the history of the cause show that the principal point was suddenly started in the Circuit Court, and scarcely at all discussed.

The question suggested, and all that remains to be considered is, what would be the effect of the payment being prohibited by the law of France?

The fact is, that the payment was not prohibited by law; but there was no appropriation by law for the payment. See Protest, Record, 25, 26. The treaty was a binding contract between the high

contracting parties from the exchange of ratifications; and by that treaty, the money was due and ought' to have been paid. It was impossible to prohibit the payment by a law of France, without assuming the grave responsibility of a wilful violation of the treaty, which is not to be presumed. A mere failure to supply the means, at the time appointed, was not of so serious a character. It might admit of explanation. But still it was a failure.

But neither the one nor the other, nor a prohibition in every respect lawful, as being clearly within the rightful authority of the legislature, could vary the rights of the parties to this bill. This was directly and deliberately decided in Mellish *v.* Simeon, 2 H. Bl. 378, 379, and in effect decided, also, in Pollard *v.* Herries, 3 Bos. & Pul. 335. The reasons are there fully set forth.

Mr. Justice McLEAN delivered the opinion of the court.

A writ of error brings this case before the court, from the Circuit Court for the eastern district of Pennsylvania.

On the 7th of February, 1833, the secretary of the treasury of the United States drew the following bill on the minister and secretary of state for the department of finance of the French government:

"Sir:—I have the honour to request that at the sight of this my first bill of exchange (the second and third of the same tenor and date unpaid) you will be pleased to pay to the order of Samuel Jaudon, cashier of the Bank of the United States, the sum of 4,856,666 francs and 66 centimes; which includes the sum of $3,916,666 66, being the amount of the first instalment to be paid to the United States under the convention concluded between the United States and France, on the 4th of July, 1831, (after deducting the amount of the first instalment to be reserved to France under the said convention,) and the additional sum of 940,000 francs, being one year's interest at four per cent. on all the instalments payable to the United States, from the day of the exchange of the ratification to the 2d of February, 1833."

This bill was purchased by the bank, and endorsed by it to Messrs. Baring, Brothers & Co., of London, and by them for value was endorsed, pay the order of N. M. Rothschild, Esq.; and by him it was directed to be paid to Messieurs De Rothschild, Brothers, or order, of Paris, for value in account.

3 Q

This bill on presentation not being paid, was protested, and was afterwards taken up on account of the first endorser by Hottinguer & Co., who also paid the costs, &c., and charged the whole sum to the Bank of the United States. Notice of the non-payment of this bill was given, in due time, to the drawer; and also that the bank claimed of the government interest, costs, and fifteen per cent. damages on the bill. The government accounted to and paid the bank the principal of the bill and the costs, but refused to pay the damages.

Sometime after the protest, a dividend on the stock held by the United States having been declared by the bank, it retained a part of the dividend to cover the above damages. A suit being brought against the bank, by the government, to recover the dividend thus withheld, the bank set up as an offset the fifteen per cent. damages claimed on the above bill

On the trial, the court held, and so instructed the jury, that the action was maintainable. That the set-off or credit claimed by the defendants was governed by the statute of Maryland. That if the bank had been the holder of the bill, at the time of the protest, it would, under the statute, be entitled to the damages claimed; but that it must be viewed as endorser, and consequently could not recover such damages, unless upon proof that they had been actually paid by the bank. To this charge the defendant's counsel excepted, and this brings before the court the questions for consideration.

Before we consider the rulings of the court excepted to, it may not be improper to notice the structure of the bill, which has been much commented on by the counsel; though not having been excepted to by the government, it is not a matter for decision.

It is supposed not to be a bill of exchange, as it was drawn payable out of a particular fund. This seems not to be the character of the bill. It was drawn for a certain sum, and the drawer then states on what account such sum was due from the French government. But there was no restriction as to what moneys or appropriation out of which the bill should be paid. This could in no sense restrain the negotiability of the instrument. It has the frame, character, and effect, of a bill of exchange. It was so called and treated by the secretary of the treasury who drew it; by his successor who had some correspondence in regard to it; by the attorney-general to whom it was submitted for his opinion, by Congress; and by the

eminent bankers in Europe through whom it was negotiated and paid.

That the United States can sustain an action against the bank, to recover a dividend declared in their favour, is undoubted. This seems to have been doubted by the counsel for the bank in the Circuit Court, but the objection has been abandoned in this court. Nor can there be any question of the right of the bank to set up, in this case, by way of offset, the damages in controversy, if the claim for damages be sustainable. This right is not contested by the attorney-general.

The main point in the case depends upon the construction of the Maryland statute, which applies to this district. It is singular that this statute, which was enacted in 1795, in regard to the question now before us, has never been construed by the local courts. And the same may be said of other and prior statutes of Maryland, containing similar provisions.

The first section of the act provides, " that upon all bills of exchange hereafter drawn in this state, on any person, corporation, company, or society, in any foreign country, and regularly protested, the owner or holder of such bill, or the person or persons, company, society, or corporation, entitled to the same, shall have a right to receive and recover so much current money as will purchase a good bill of exchange of the same time of payment, and upon the same place, at the current exchange of such bills, and also fifteen per cent. damages upon the value of the principal sum mentioned in such bill, and costs of protest, together with legal interest upon the value of the principal sum mentioned in such bill from the time of protest, until the principal and damages are paid and satisfied: and if any endorser of such bill shall pay to the holder, or the person or persons, company, society, or corporation, entitled to the same, the value of the principal, and the damages and interest as aforesaid, such endorser shall have a right to receive and recover the sum paid, with legal interest upon the same, from the drawer, or any other person or persons, company, society, or corporation, liable to such endorser upon such bill of exchange."

That the holder of a foreign bill, or other person entitled to it, may recover, under this statute, from the drawer, in case of protest, a sum that will purchase a similar bill of the same amount, together with fifteen per cent. damages on the principal sum, is admitted.

But it is insisted that the bank paid the bill as endorser, and that as there is no proof that it paid the fifteen per cent. damages, they are not recoverable under the statute. The first part of the section gives to the holder of a protested bill its value at the place drawn, the fifteen per cent. damages, and interest upon the value of the principal sum. The latter part of the section gives to the endorser, who has paid to the holder the value of the principal, the damages and interest on the entire sum paid, with legal interest. So that while the holder of the bill recovers only interest upon the principal sum, the endorser is entitled to interest on the whole sum paid by him. And to give interest on this sum seems to have been the object of the latter clause of this section.

Had the bank retained the bill until its presentation and protest, there could be no question of its right, as holder, to the damages claimed. It endorsed the bill to Baring, Brothers and Co., and they to Rothschild, who endorsed it to De Rothschild and Brothers. These last were the holders, and had not the bill been paid, *supra protest*, on account of the bank, as first endorser, they would have been entitled to the damages. Hottinguer and Co., having paid the bill for the honour of the bank, became the holders, and could recover the damages from it or the drawer. But they being the depositories of the bank, charged it with the amount they paid, by which the bank was remitted to its original character as payee and holder of the bill. In this light the bank was viewed and treated by the government, for it paid not only the principal sum and interest to the bank, but also the costs of protest and other expenses chargeable under the laws of France. But the damages allowed by the statute were refused.

It has been intimated that these damages must be considered as a penalty, and not as a part of the bill. This is a mistaken view of the subject.

Had there been no statute, the bank, as the holder of the bill, would have been equally entitled to damages. They would have been claimed on a different principle, and might have been of a greater or less amount according to circumstances. The origin and character of a bill of exchange are found in the law-merchant: that law which pervades the commercial world, and which, though founded on usage, has become as fixed and definite as any other branch of the law. Under this law the drawer of a bill in this country payable in

Bank of the United States v. The United States.

a foreign country is liable, should such bill be protested, not only for the costs of protest and other incidental charges, but also to re-exchange on the bill. The exchange is sometimes direct, at other times circuitous, depending in some degree upon the commercial intercourse between the countries where the bill is drawn, and where it is made payable. Between this country and France, the exchange is often, if not generally, by the way of London.

The bill under consideration having been protested at Paris for non-payment, the holder under the general commercial law was entitled to a bill drawn at that place, payable in this city, for such sum as would pay the original bill at Paris, including costs of protest and other legal charges. This is re-exchange, and it varies, as must be seen, with the fluctuations of commercial intercourse, influenced somewhat by local circumstances and the general state of the money market. In some instances, owing to peculiar circumstances, re-exchange has been found to exceed forty or even fifty per cent. To avoid so ruinous a charge, so uncertain a rule of damages, and one so difficult to establish by evidence, the state of Maryland, and almost all the other states of the Union, have fixed, by legislation, a certain amount of damages on protested foreign bills, in lieu of re-exchange. Experience has shown that this is a judicious regulation. It relieves the parties to the bill from great uncertainty, and promotes punctuality by showing the drawer what damages he must pay on the dishonour of his bill. Fifteen per cent. on the principal sum, which the statute adopts, may be greater than the actual re-exchange in the present case. But, whether this be so or not is not open for inquiry. It is believed that if this per cent. excluded the re-exchange, at the time this bill was protested, there are many other cases in which it would fall short of that charge. The statute has, probably, fixed an amount which would be an average charge for re-exchange. This being the basis of the act, the damages cannot be considered as a penalty. The damages given by the statute are as much a part of the contract as the interest. On this point there is believed to be no difference of opinion among enlightened courts or commercial men.

The doctrine of re-exchange is founded upon equitable principles. A bill is drawn in this country, payable at Paris, in France. The payee gives a premium for it under the expectation of receiving the amount at the time and place where the bill is made payable. It is

protested for non-payment. Now the payee and holder is entitled to the amount of the bill in Paris. The same sum paid in this country, including costs of protest and other charges, is not an indemnity. The holder can only be remunerated by paying to him, at Paris, the principal, with costs and charges; or by paying to him in this country those sums, together with the difference in value between the whole sum at Paris, and the same amount in this country. And this difference in value is ascertained by the premium on a bill drawn in Paris and payable in this country, which should sell at Paris for the sum claimed. The statute of Maryland then is founded on equitable considerations, although the rule of damages may be considered arbitrary, as it does not yield to circumstances.

In this case the bank purchased the bill from the government and paid for it. It was sold and transferred by the bank. But the bill not being paid to the holder, the bank paid the amount of it, including the costs of protest and other charges, to Hottinguer and Co., at Paris, who had taken it up *supra protest*, for the honour of the first endorser. The bank, in this manner, came again into possession of the bill, the endorsements, in effect, being stricken out. In a commercial and legal-sense, then, the bank is the holder of the bill, and has the same claim for damages as if it had never been endorsed. Had the government been suable by the bank, it must have declared and recovered as payee and holder, and not as endorser of the bill.

No objection is taken, in the bill of exceptions, as to the liability of the government to damages, on a protested bill of exchange drawn by it, the same as an individual. No such question, therefore, arises in this case. As the holder of a protested bill, the government exacts damages; it would seem to be equitable, therefore, that as drawer under like circumstances, it should pay them.

Upon the whole, we think, that in view of the circumstances of this case, the bank is entitled to the fifteen per cent. damages, under the Maryland statute, and that, consequently, the instructions of the Circuit Court were erroneous. The judgment of that court is, therefore, reversed, and the cause is remanded to that court, and a *venire de novo* is awarded, &c.

Mr. Justice CATRON.

By the instructions given by the Circuit Court, the controversy is made to turn on the construction of the statute of Maryland; nor does

the record raise any question on the transaction growing out of the fact, that it was one between governments, to obtain a sum of money due from the one to the other; in which the corporation acted as an instrument and agent, in a form suggested by itself, to obtain the money.   For instance: if it be true, that the United States, in fact, received no money from the bank for the bill, it not having been charged to the bank; this being found, with the additional fact, that the parties intended to await the event of payment, or refusal, on the part of France, and let the bank hold and use the money awaiting the event; then the question on the equity of the case may arise. But the jury did not pass on any such facts, the instruction given rendering the inquiry unnecessary; and so it cut off every other question the plaintiff might have raised in opposition to the offset claimed.

The foregoing is given merely as an instance, to show that no question arises on the record, but on the construction of the act of 1785.

The statute provides for two classes of cases: 1st, "the owner or holder of the protested bill, or the person or persons, company, society, or corporation entitled to the same;" and 2dly, "any endorser of the bill who should pay to the holder, or the person or persons, company, society, or corporation entitled to the same, the value of the principal and the damages and interest."

In the first class, the "owner or holder," &c., shall have a right to receive and recover so much current money as will purchase a good bill of exchange of the same time of payment, and upon the same place, at the current exchange of such bills, and also fifteen per cent. damages upon the value of the principal sum mentioned in such bill, and costs of protest, together with legal interest upon the value of the principal sum mentioned in such bill, from the time of protest, until the principal and damages are paid and satisfied.

In the second class, the endorser who has paid the principal, damages, and interest, shall have a right to receive and recover the sum paid, with legal interest upon the same, from the drawer or any other person or persons, company, society, or corporation, liable to such endorser upon such bill of exchange.

It is not necessary to inquire whether this statute includes all possible cases, and if it does not, by what law the cases so unprovided for would be governed, because the bank is seeking, in this instance,

to bring itself within the statute; unless it does so, the precise claim of fifteen per cent. cannot be sustained. The charge of the court below was twofold.

1. That the case was governed by the law of Maryland, and

2. Construing that law.

The bill of exceptions includes both points; but this court has proceeded to examine and decide the cause on the second only, passing over the first.

The bank must then bring itself within one of the two classes above described; let us examine them in order.

Was the bank at the time when its present rights accrued, the "owner or holder of the bill." I say at the time its present rights accrued, because this general proposition includes the rights acquired at the time of protest, or acquired subsequently—each of which branches must be separately examined.

The bill was endorsed to Messrs. Baring, Brothers and Co., of London, on some day which the record does not state: that it was sold to the Barings, and not sent over for collection, is not controverted, nor open to question.

It was then passed by endorsement to N. M. Rothschild, and from him to the Messrs. Rothschild in Paris, in whose possession it is found on the day that it became due. It was at their request that a demand was made, by the notary, for payment, and upon refusal, that the bill was protested. So far, they appear to have been, and no doubt were, both the "owners and holders of the bill," and the only "persons entitled to the same at the time of the protest."

Hottinguer and Co. intervened immediately after protest, and paid the bill for the honour of the bank. What rights were then acquired?

It will not be necessary to examine and decide whether they acquired a right to fifteen per cent. damages or not; or to comment upon the want of harmony in the law, if it were to allow to a volunteer, who had no right to complain of anybody, the same damages which it gives to a disappointed and suffering party expressly because he has been put to great inconvenience and to hazard of discredit, by the omission of the drawer to provide the necessary funds to meet the bill. The books and cases all recognise the right of such a volunteer to principal, interest, and costs. If Hottinguer and Co. were the parties to this suit, it would become necessary to ex-

amine the question of their claim to damages; but we are now inves-
tigating the rights of the bank.

Granting that the Messrs. Rothschild, immediately upon protest,
became vested with the right, under the statute, to "receive and
recover" from the drawer fifteen per cent. damages in addition to
the other sum pointed out in the law; and granting also, for the sake
of the argument, that all these rights passed to M. Hottinguer, with
the delivery of the bill, it is clear that he was vested with a right
that he could exercise or not at his pleasure. If he forbore to claim
the damages, he mutilated the rights attached to the bill, supposing
all the rights of the parties to be transferred with the bill from one to
another. His right to relinquish the damages cannot well be dis-
puted. It was property, and could be given away. It is not our
province to inquire into his reasons; we can deal only with facts.
It appears from the record, that instead of charging fifteen per cent.
damages, he contented himself with charging a commission of one-
half per cent., amounting to 24,283 francs and 33 centimes; less
than 5000 dollars. This commission may have been paid to him
by the bank, and it appears from a report from the first auditor's
office, dated July 29, 1837, that this commission would be paid by
the United States to the bank upon presentation of a proper voucher.

There is nothing in the record to show that Hottinguer and Co.,
even up to this time, sanction this claim of fifteen per cent., or that
the bank intends to pay it over to Hottinguer and Co., if it shall
succeed in compelling the United States to pay it. On the contrary,
the claim of the bank appears to be prosecuted for its own benefit;
and the result will be that the bank, if it succeeds in this suit, will
pay to Hottinguer and Co. less than $5000, and keep $165,000
for itself.

At the time of the protest, and immediately afterwards, compre-
hending the payment *supra protest*, and protest itself, either Roths-
child or Hottinguer and Co. were the "owners or holders" of the
bill, as described in the first class of the statute, and of course no
rights whatever accrued to the bank. Did it subsequently acquire
any?

In what particular manner the bill was transferred by Hottinguer
and Co. to the bank after protest and payment—whether by general
or special endorsement, or by a receipt upon the bill—the record
does not show. It only says that "the bill of exchange and protest

were transmitted to the bank, which thereby, and by reason of the premises, became and were again holders and owners of the same." But the claim for fifteen per cent. damages had been voluntarily waived, as we have seen, by Hottinguer and Co., and it is not easy to see how any person claiming under them could have any more rights than those which the assignors chose to insist upon. The mere possession of the bill is not sufficient, because that possession was accompanied by a cotemporaneous declaration that Hottinguer and Co. intended to claim nothing more than one-half per cent. commission.

It is not perceived, then, how the bank can bring itself within the class of cases provided for in the first branch of the statute. Is it within the second?

This depends entirely upon the answer to the question, has it, as endorser, paid the damages to the owner or holder of the bill, or to any one? If it has, the record does not show it. On the contrary, all that it has paid was the commission of a half per cent. to Hottinguer and Co., if indeed it has paid that, for there is no evidence of it. The propriety of the statute is not the subject of examination; but it may be remarked that it appears to be founded on reason and justice. Every successive endorser, as he transfers a bill of exchange, receives from the endorsee its full value; and being thus reimbursed for his outlay in the purchase of the bill, the inconvenience which falls upon somebody when the bill is protested does not touch him. His account is already balanced. The reason therefore for allowing damages utterly ceases as to him. He has no fresh bill to purchase, either by re-exchange or in any other manner. But when he is made responsible, as he may be, to the holder, for the amount of the bill and damages, it is fair and reasonable that the same liability should travel upward until it is ultimately fastened upon the drawer; each endorser being obliged to refund to the one below him exactly what that one has been compelled to pay. But the bank has not paid these damages, and consequently is not within the second class of cases.

Being not within the statute at all, the claim for damages cannot be sustained.

The argument that the fifteen per cent. is not damages, but exchange, is entirely unsound, as I conceive, in this case. The statute gives exchange from the place of drawing interest, costs of protest,

and fifteen per cent. damages, in addition.  The first is indemnity; the second a penalty.  By commercial men the first is construed liberally, as within the general rule governing bills of exchange, with the difference of estimating the exchange from the place of drawing, instead of re-exchange; the right to the penalty is strictly construed, according to the words of the statute.  Its plain meaning must govern the merchant and business man; for him it was made. He is told that the owner of a bill, at the time of its protest, shall be entitled to fifteen per cent. damages from the drawer, or endorser, in every case; and that the endorser shall be entitled to the same, (from the drawer, or a prior endorser,) provided the owner makes him pay the fifteen per cent.; not otherwise.  And this I understand to have been the uniform mode of proceeding under the statute by the merchants of Maryland, under the 1st and 3d sections of the act; nor does it appear by the books of reports of that state, that this interpretation by business men has ever been questioned in the courts of justice there.  For the reasons stated, I think the instruction given to the jury in the Circuit Court was proper, and that the judgment ought to be affirmed.

Mr. Justice WAYNE.

I concur in the opinion that the judgment of the court below ought to be reversed, but not for the reasons given in the opinion of the court.

### ORDER.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States, for the Eastern District of Pennsylvania, and was argued by counsel.  On consideration whereof, It is now here ordered and adjudged by this court, that the judgment of said Circuit Court in this cause be, and the same is hereby reversed; and that this cause be, and the same is hereby remanded to the said Circuit Court, to award a *venire facias de novo.*

*Note by the Reporter.*—The Chief Justice did not sit in this case, and his opinion is therefore placed in an appendix.